HAMMER et al. v. CUTLER–HAMMER MFG. CO. OF WISCONSIN et al.*

(Circuit Court of Appeals, Seventh Circuit.   January 5, 1904.)

No. 999.

1. PATENTS—INFRINGEMENT—ELECTRIC SWITCH FOR MOTORS.

The Blades patent, No. 418,678, for an electric switch for motors, was not anticipated, and discloses patentable invention.   Claims 1 and 4 also *held* infringed.

Appeal from the Circuit Court of the United States for the Northern Division of the Northern District of Illinois.

For opinion below, see 124 Fed. 222.

This is an appeal from a decree adjudging appellants to be infringers of claims 1 and 4 of letters patent No. 418,678, January 7, 1890, to Blades, assignor, for an electric switch for motors.

Claim 1 is as follows:   "(1) In a shunt-wound electric motor, the combination, with the field-circuit, of a magnet in said circuit, a hand-switch adapted to open and close the armature-circuit, said switch arranged to be held in its closed position by the magnetism of the said magnet, and means for automatically retracting the said switch to its initial position when the magnet is de-energized by the cessation of the current through the field magnet, substantially as described."

Claim 4 is the same, except that the means for retracting the switch to its initial position is limited to a spring.

The opinion of the Circuit Court, reported in 124 Fed. 222, cites the prior patents.

Francis W. Parker, Edward Rector, and Donald M. Carter, for appellants.

W. Clyde Jones and Keene H. Addington, for appellees.

Before JENKINS and BAKER, Circuit Judges, and BUNN, District Judge.

BAKER, Circuit Judge.   The record shows that between 1880 and 1890 there was a rapid development of the electric motor for commercial uses.   The series motor, in which the whole current passes in direct connection through the field and the armature, and in which therefore a varying load on the motor in a constant potential circuit would produce changes in revolution from a possibly excessive speed under no load to an undesirable slowness under full load, was found serviceable in cases where the load was constant, or where, the load being

* Petition for rehearing dismissed March 30, 1904.

variable, an attendant was continuously at hand to adjust the current to the load. For factory use, where machines and tools, to perform their functions properly, are required to run at a fixed speed irrespective of changes of work from moment to moment, something steadier was sought, and it was found in the shunt-wound motor in a constant potential circuit, in which the current is divided before entering the motor, the major portion passing through the armature and the minor through the field. At first the shunt-wound motors were made with high resistance armatures to prevent their being burned out when the current was turned on and before the motor had developed its counter electric pressure to protect itself. These motors came nearer the mark of self-regulation than the series kind, because the field, being in shunt, was independent of the varying stress on the armature; but the high resistance in the armature, the rotational energy of the field-magnet remaining constant, left the speed somewhat subject to variations of the load. At this stage of development, several inventors gave their attention to devising governors or regulators. It was next discovered that a shunt-wound motor with an armature of the least practicable resistance was virtually self-regulating under varying loads. But this type was especially susceptible to being burned out at starting and before the motor had acquired a protective speed. So the starting-box, or hand-switch, was inserted in the armature circuit, and its sufficient resistance to the current could be cut out gradually by moving the switch-arm from one contact point to another, until, when the current was fully on, the motor would be in a state of self-defense.

The self-regulating shunt-wound motor with starting-box had been in commercial use some considerable time before Blades entered the field. It was attended with these dangers: The accidental opening of the field circuit, which would likely be destructive of the armature; the leaving of the switch-arm on an intermediate contact point, which would destroy the starting-box, as its resistance coils were not intended nor adapted to be left in circuit; and the failure to return the switch-arm to its initial position, whereby, if the motor should stop on account of the current's being cut off by the opening of a switch at the factory or at the central station, or by the blowing out of a fuse, or diminished by a sufficient drop of potential, and if the current were then turned on or the potential restored, the low resistance armature would be burned out. Manufacturers, with whom were associated some of the greatest inventors and students in the electrical world, well understood and warned their customers against these perils.

The structure portrayed by the patent in suit not only protects the motor and the starting-box from all the aforestated dangers, but affords additional benefits by effecting an instantaneous release when the field circuit is broken, and a delayed release when the current supply is cut off. This device won immediate recognition and went into general commercial use.

The bringing together, within the mental vision, of these manifold difficulties and the means for overcoming them all, and conferring new advantages, we think evinced a high degree of invention, unless the prior art showed the way and left no room for initiative. To give the results of our examination of the prior art, we think it unnecessary

to detail the structures of the reference patents. The shunt-wound motor with low resistance armature and hand-switch or starting-box was old. The electro-magnet dated back to the beginnings of the electric art. Springs of one sort or another had been employed in various arts, including the electrical.

In regulators for electric generators, and in governors for motors with high resistance armatures, magnets and springs had been balanced against each other on the contact-arms of resistance-coils that were left permanently in circuit, so that a loss in current, by diminishing the energy of the magnet, would permit the spring to pull the contact-arm to a point of less resistance, and vice versa, thus producing a floating switch. The inventors of these devices had not in mind the problem Blades solved, for it had not yet arisen, and the means they applied to their problems will not obviate the perils that were found to attend the shunt-wound motor with low resistance armature and manual starting-box.

In cases where it was desired to start a motor at a distant point without an attendant, a pulling magnet, energized when the current was turned on at the central station, was used to pull, as would the hand of a present operator, the contact-arm of the starting-box from its off to its on position. In these automatic starters no spring is opposed to the magnet. In automatic starters, as such, an opposed spring would be worse than useless; for, the end to be attained being the pulling of the switch-arm from its off to its on position, any force that resists is counter to the object in view. These inventors therefore designedly left out the spring from their combinations as being an element hostile to the accomplishment of their purpose. And if a skilled mechanic, desirous of adding the protective functions of the patent in suit to the function of the automatic starter, had opposed a spring to the pulling magnet in the field circuit, he would have found that the magnet, to be strong enough to pull the switch-arm through its arc against the resistance of the spring, would draw off so much energy from the field that the armature would speed up to a degree that would make the motor commercially inoperative. Not only are starting and stopping opposite operations, but just as there is a material difference between the field-magnet and the pulling magnet of the automatic starter (though magnets are magnets) so we think there is a vital distinction between the pulling magnet of the automatic starter and the retaining magnet of the patent in suit.

Dangers to a motor in operation may arise from an excessive current. The fuse is the ordinary protective device. Certain inventors employed pulling magnets, put into action by the excess of current, to shut down the motor. These overpressure protective devices are inert in the presence of the dangers that threaten from underpressure or no pressure. Their devisers were considering a different problem, and the structures themselves are incapable of filling the office of the instrument described in appellees' patent.

One inventor, preceding Blades, addressed his attention to the dangers to a self-regulating shunt-wound motor in a constant potential circuit that come from a cessation or material loss of current, but missed the mark by directing his efforts to the wrong point, the main

switch. As we read the Shepardson patent, it contains no hint of the Blades structure.

The prior art contains no equivalent combination. We think that there was patentable novelty in the application of an underload retaining magnet to a manual starting-box, in the location of such a magnet in the field circuit of a self-regulating shunt-wound motor, and in adjusting it to act in that location with the starting-box located in the armature circuit. We find nothing in the prior art to militate against the allowance of the claims in suit.

Appellants insist that these claims, which limit the location of the magnet to the field circuit of a shunt-wound motor, must fall by reason of amendments made while the application was pending. The original specification located the magnet "preferably in the field circuit." The field circuit, as distinguished from the. armature circuit, implies the shunt-wound motor. No matter, therefore, how broad the applicant made the original description of his invention, the narrowing of the specification and the limitations of the claims in suit left the invention as now claimed within the preferred range of the original specification.

We think the record contains sufficient evidence of infringement. The decree is affirmed.